347 F.3d 1101
 Susan Marie WEBER, Plaintiff-Appellant,
v.
Kevin SHELLEY,* in his official capacity as California Secretary of State; Mischelle Townsend, in her official capacity as Riverside County Registrar of Voters, Defendants-Appellees.
 No. 02-56726.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 8, 2003 — Pasadena, California.
 Filed October 28, 2003.
 
 Susan Marie Weber, in propria persona, Palm Desert, California, plaintiff-appellant.
 Douglas J. Woods, Deputy Attorney General, Sacramento, California, for defendant-appellee California Secretary of State.
 Robert M. Pepper, Deputy County Counsel, Riverside, California, for defendant-appellee Mischelle Townsend.
 Appeal from the United States District Court for the Central District of California Stephen V. Wilson, District Judge, Presiding. D.C. No. CV-01-11159-SVW.
 Before: Pamela Ann Rymer and Richard C. Tallman, Circuit Judges, and Ronald B. Leighton,** District Judge.
 OPINION
 RYMER, Circuit Judge.
 
 
 1
 This appeal challenges the computerized touchscreen voting system that Riverside County, California, adopted to replace traditional paper ballots after the system was certified for accuracy, reliability, and feasibility by the Secretary of State of California.
 
 
 2
 Susan Marie Weber, a resident and registered voter of Riverside County, brought an action under 42 U.S.C. § 1983 claiming that the lack of a voter-verified paper trail in the Sequoia Voting Systems AVC Edge Touchscreen Voting System that the county installed violates her rights to equal protection and due process.[1] The district court found no evidence that use of Riverside County's touchscreen system constitutes differential treatment of voters, and concluded that use of the system does not impair Weber's right to vote because the AVC Edge System is a reasonable choice, protects against fraud, and advances a number of important state interests. Accordingly, the court entered summary judgment for the county and state. We agree that Weber has raised at most a hypothetical concern about the ability to audit and verify election results, and that the impact on her right to vote is minimal. Therefore, we affirm.
 
 
 3
 * The Secretary of State of California is the chief election officer of the state. Cal. Elec.Code § 19100 et seq. In this role, the Secretary is responsible for the general supervision of elections and administration of the election laws. His duties include setting standards for, and certifying, various voting machines and systems. The Secretary is also required to establish regulations governing voting machines to ensure that each system, among other things, is "safe from fraud or manipulation." Id. § 19205(c).
 
 
 4
 No voting system may be used unless it has received the Secretary's approval. Id. § 19201. For certification, equipment must have been tested and approved according to Federal Elections Commission (FEC) and National Association of State Election Directors (NASED) standards. The hardware and software must also pass muster under standards set out in the Secretary's "Procedures for Approving, Certifying, Reviewing, Modifying, and Decertifying Voting Systems, Vote Tabulation Systems, Election Observer Panel Plans, and Auxiliary Equipment, Materials, and Procedures" (the SOS Procedures). See http://www.ss.ca.gov/elections/vsp—procedures.pdf. The SOS Procedures require the machine and device to be suitable for the purpose intended; to preserve the secrecy of the ballot; to be safe from fraud and manipulation; to be auditable for the purpose of an election recount or contest procedure; to comply with appropriate federal and California laws; to have been certified by a nationally recognized test laboratory; and to promote voting accessibility for people with disabilities. Once the Secretary assembles a list of certified voting systems, individual counties may choose any particular system from the list. Cal. Elec.Code § 19210 ("The governing board [of each county] may adopt for use at elections any kind of voting system, any combination of voting systems, any combination of a voting system and paper ballots, provided that the use of the voting system or systems involved has been approved by the Secretary of State or specifically authorized by law.").
 
 
 5
 In 1990, the FEC approved the Performance and Test Standards for Punchcard, Marksense, and Direct Recording Electronic (DRE) Voting Systems. These standards continue to be used by NASED. Thereafter, California began testing touchscreen voting systems to gauge their accuracy, reliability, and feasibility as an alternative to paper ballots.
 
 
 6
 In touchscreen (DRE) systems, a voter whose eligibility has been verified by an election official is given a card that is used to activate a freestanding voting machine. On-screen directions tell the voter how to select candidates or issues by touching the screen over the corresponding choice. The voter may make changes by de-selecting a response already made, and making another selection in its place. The voter is required to review the entire ballot at the end of the process. The voter then touches a yellow "Cast Vote" cue on the last screen to record his or her vote.
 
 
 7
 Once a ballot has been cast, the unit ejects the activation card, which the voter returns to the precinct election officer. The card cannot be used again without the election officer activating it. After the polls have closed, cartridges are removed from the units and sealed in a secured pouch for counting. An electronic cartridge reader then accumulates and transmits votes to a central elections headquarters through the county's secure data network.
 
 
 8
 The state's testing showed that touchscreen systems protect against the possibility of fraud and manipulation by using redundant data paths and ballot images, by allowing instantaneous systems checks between the voting data, which is stored in triplicate, and by possessing the capability to reproduce a printed facsimile of every ballot cast. The Secretary conditionally certified the AVC Edge System in July 1999, and again, with modification, in December 2001. The conditions were met and are not at issue in this action.
 
 
 9
 On the recommendation of a county task force assembled to study different voting systems, the Riverside County Board of Supervisors voted in 1999 to adopt touchscreen voting. The county concluded that touchscreen balloting systems are more accurate and more reliable than paper balloting systems; that touchscreen systems facilitate voting by wheelchair-bound, visually impaired, and foreign language-speaking voters; that touchscreen systems improve the speed and accuracy of recounts; that touchscreen systems increase voter turnout by enabling counties to conduct early voting programs; and that touchscreen systems are cost-effective. The county first used the AVC Edge System during the 2000 Presidential election, and has used these same units for federal, state, and local elections ever since.
 
 
 10
 Weber seeks an order declaring that use of paperless touchscreen voting systems is unconstitutional and requiring the county and state to withdraw touchscreen voting systems that have no hard-copy paper ballot. The parties brought cross-motions for summary judgment, and the district court granted the state's. Weber timely appealed.
 
 II
 
 11
 Weber makes a number of interrelated arguments, which boil down to distrust of a system that records a vote without a paper trail. She asks us to adopt a rule that the right to vote is infringed when the ease with which ballots can be manipulated is greater than the ease with which the manipulation can be detected. In her view, this is true of paperless touchscreen voting systems because undetectable flaws can be slipped into the programming code. She contends that the district court missed this point by confusing accuracy of the system and verification of the vote. It is the latter about which Weber complains, and she maintains that declarations from her experts (which she claims the district court ignored) support her concern. Further, she submits that the court misapplied Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), by failing to subject paperless touchscreen systems to strict scrutiny because, as Weber sees it, infringement of the right to vote is neither minor nor isolated given the absence of a certification standard for an independent audit of source documents. Without paper ballots and an audit of them, Weber posits that the Secretary of State cannot discharge his responsibility to assure that voting systems are "safe from fraud and manipulation." Cal. Elec.Code § 19205(c). Finally, she points out, there are touchscreen systems that do produce a paper ballot, thus the burden of correcting the constitutional deficiency would be minimal.
 
 
 12
 * We first resolve Weber's contention that the district court erred by ruling her expert testimony inadmissible. She proffered declarations of Kim Alexander, the president of the California Voter Foundation, Peter Neumann, a computer scientist, and Roberta Mercuri, an author and consultant on computer-related risks. Weber asserts that each is qualified in the intersection of computer science and public policy, something we need not decide because the district court did not hold otherwise. The court focused on whether the declarations raised genuine issues of material fact about the relative accuracy of DRE voting systems. It excluded references to newspaper articles and unidentified studies absent any indication that experts normally rely upon them, which was not an abuse of discretion under Fed.R.Evid. 703, and concluded that the admissible opinions which were left do not tend to show that voters in Riverside County have a lesser chance of having their votes counted.
 
 
 13
 We agree. At most, the declarations state that a paper ballot which is verified by the voter before the ballot is cast would provide an audit trail in the event of disputes, that it is impossible to demonstrate the absence of programming errors or malicious code in a computational product such as the AVC Edge System, that the AVC Edge System has a significant "lost vote rate," and that the lack of a requirement that the system be independently voter-verified — by using a human-readable medium at the time of balloting — is a fatal flaw that renders the touchscreen units unauditable. However, there is no indication that the AVC Edge System is inherently less accurate, or produces a vote count that is inherently less verifiable, than other systems.
 
 B
 
 14
 It is a well established principle of constitutional law that the right to vote is fundamental, as it is preservative of all other rights. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). However, it is also clear that states are entitled to broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner. See, e.g., Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (noting "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."); Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (recognizing that "there must be a substantial regulation of elections if they are to be fair and honest," and that states have broad leeway in "enact[ing] comprehensive and sometimes complex election codes ... [that] govern[ ] ... the voting process itself") (citation and internal quotation marks omitted).
 
 
 15
 The difficulty is that every electoral law and regulation necessarily has some impact on the right to vote, yet to strike down every electoral regulation that has a minor impact on the right to vote would prevent states from performing the important regulatory task of ensuring that elections are fair and orderly. The Supreme Court recognized as much in Burdick, observing that "[e]lection laws will invariably impose some burden upon individual voters." 504 U.S. at 433, 112 S.Ct. 2059. This being so, the Court formulated a balancing test for evaluating constitutional challenges to electoral laws:
 
 
 16
 A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the ... Fourteenth Amendment[ ] that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.
 
 
 17
 Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens ... Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the ... Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.
 
 
 18
 Id. at 434, 112 S.Ct. 2059 (citations and internal quotation marks omitted).
 
 
 19
 Under Burdick, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect. Cf. Hussey v. City of Portland, 64 F.3d 1260, 1265 (9th Cir.1995) ("[C]ourts do not subject every voting regulation to strict scrutiny.") (citation and internal quotation marks omitted). Rather, the question is whether using a system that brings about numerous positive changes (increasing voter turnout, having greater accuracy than traditional systems, being user-friendly, decreasing the number of mismarked ballots, saving money, etc.), but lacks a voter-verified paper ballot, constitutes a "severe" restriction on the right to vote.
 
 
 20
 We cannot say that use of paperless, touchscreen voting systems severely restricts the right to vote. No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, "hanging chads," and other mechanical and human errors that may thwart voter intent. See generally Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Meanwhile, touchscreen voting systems remedy a number of these problems, albeit at the hypothetical price of vulnerability to programming "worms." The AVC Edge System does not leave Riverside voters without any protection from fraud, or any means of verifying votes, or any way to audit or recount. The unfortunate reality is that the possibility of electoral fraud can never be completely eliminated, no matter which type of ballot is used. Cf. Hennings v. Grafton, 523 F.2d 861, 864 (7th Cir.1975) ("Voting device malfunction [and] the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with ... fall far short of constitutional infractions...."). Weber points out that none of the advantages of touch-screen systems over traditional methods would be sacrificed if voter-verified paper ballots were added to touchscreen systems. However, it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems.[2] So long as their choice is reasonable and neutral, it is free from judicial second-guessing. In this instance, California made a reasonable, politically neutral and non-discriminatory choice to certify touchscreen systems as an alternative to paper ballots. Likewise, Riverside County in deciding to use such a system. Nothing in the Constitution forbids this choice.
 
 
 21
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Kevin Shelley is substituted for his predecessor, Bill Jones, as California Secretary of State. Fed. R.App. P. 43(c)(2)
 
 
 **
 The Honorable Ronald B. Leighton, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 The named defendants are Mischelle Townsend, the Riverside County Registrar of Voters, and Bill Jones, the California Secretary of State (for whom we have substituted the current Secretary, Kevin Shelley). Because they are sued in their official capacity, we refer to the parties as the county (Riverside) or state (California). The county joined in the briefs filed by the state
 
 
 [2]
 See, e.g., McDonald v. Bd. of Election Comm'rs of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (noting that "a legislature need not run the risk of losing an entire remedial [electoral] scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."); cf. Bush, 531 U.S. at 134, 121 S.Ct. 525 (Souter, J., dissenting) ("[L]ocal variety [between voting mechanisms] can be justified by concerns about cost, the potential value of innovation, and so on."); Hendon v. N.C. State Bd. of Elections, 710 F.2d 177, 181 (4th Cir.1983) ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); Pettengill v. Putnam County R-1 Sch. Dist., 472 F.2d 121, 122 (8th Cir.1973) ("[T]he appellants' [vote dilution] complaint asks the federal court to oversee the administrative details of a local election. We find no constitutional basis for doing so...."); N.Y. State Democratic Party v. Lomenzo, 460 F.2d 250, 251 (2d Cir.1972) (recognizing "the wide latitude which the state has in deciding the manner of conducting elections, and, therefore, ... the form ... of the ballot"); Powell v. Power, 436 F.2d 84, 86 (2d Cir.1970) ("Were we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law."); Green Party of N.Y. v. Weiner, 216 F.Supp.2d 176, 190-91 (S.D.N.Y.2002) (dismissing the Green Party's challenge to the state's use of paper ballots during its primary on the ground that "[i]t may or may not be desirable for New York to purchase more or newer voting machines, or to adopt some more modern technology for conducting elections.... But that debate is for the elected representatives of the people to decide, after balancing the pros and cons of different systems against their expense.").