[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-16280

_____

D. C. Docket No. 04-80216-CV-JIC

ROBERT WEXLER,Congressman,
ADDIE GREENE, Commissioner,
BURT AARON, Commissioner,
TONY FRANSETTA,

Plaintiffs-Appellants,

versus

ARTHUR ANDERSON,
Supervisor of Elections for Palm Beach County,
KAY CLEM,
Supervisor of Elections for Indian River County,
Florida and President of the Florida Association of
Supervisors of Election,
FLORIDA SECRETARY OF STATE,
Glenda E. Hood,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(June 20, 2006)**

Before DUBINA and KRAVITCH, Circuit Judges, and STROM[*], District Judge.

KRAVITCH, Circuit Judge:

The issue presented in this appeal is whether Florida's manual recount procedures in those counties employing paperless touchscreen voting machines violate the rights of voters in those counties to equal protection and due process under the Fifth and Fourteenth Amendments to the United States Constitution. For the reasons that follow, we hold that they do not.[1]

I. Facts

Florida's Voting System

Florida's Electronic Voting Systems Act makes Florida's Department of

_____

[*] Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

[1] Prior to oral argument, the parties submitted supplementary briefs on the issue of whether the present appeal was rendered moot by either: (1) the passage of the Help America Vote Act ("HAVA") or (2) the expiration of the emergency rule that formed the basis of the district court's decision. We conclude that because the parties' differing interpretations of HAVA's requirements to a certain extent restate the present controversy and because the lapsed emergency rule has been replaced by a substantively identical permanent rule, the instant appeal is not moot.

State responsible for developing and adopting standards for electronic voting and for certifying electronic voting systems for use in the state. See Fla. Stat. §§ 101.5601-101.5614. Each county may then choose its own voting equipment from among those systems certified by the Department of State. Fla. Stat. § 101.5604; see also Fla. Stat. § 101.294. In fifteen of Florida's sixty-seven counties, voters cast their votes using paperless touchscreen voting machines, which require that voters make their selections directly on computer screens by literally touching the screen as indicated. In the remaining fifty-two counties, voters cast optical scan ballots. To vote using an optical scan ballot, a voter uses a pencil to fill in a bubble or arrow by the name of the candidate he wishes to vote for; the ballot is then run through an automatic tabulation machine. Voters casting absentee or provisional ballots in touchscreen counties also submit optical scan ballots.

Manual Recount Procedures

Florida law provides for a two-stage recount procedure in certain close elections. First, if the margin of victory is one-half of a percent or less, election officials conduct a "machine recount," which entails re-tabulating ballots in precincts using optical scan ballots, Fla. Stat. § 102.141(6)(a), and, in touchscreen voting precincts, examining "the counters on the precinct tabulators to ensure that the total of the returns on the precinct tabulators equals the overall election return."

3

Fla. Stat. § 102.141(6)(a). Second, if the results of the machine recount indicate a margin of victory of one-quarter of a percent or less, officials conduct a manual recount of all "overvotes" and "undervotes" (collectively, "residual votes"). Fla. Stat. § 102.166. An overvote results when "the elector marks or designates more names than there are persons to be elected to an office or designates more than one answer to a ballot question, and the tabulator records no vote for the office or question." Fla. Stat. § 97.021(23). An undervote results when "the elector does not properly designate any choice for an office or ballot question, and the tabulator records no vote for the office or question." Fla. Stat. § 97.021(37).

During the manual recount phase, auditors review residual votes to determine if there is a "clear indication on the ballot that the voter has made a definite choice." Fla. Stat. § 102.166(5)(a). To that end, the Department of State is charged with: (1) adopting "specific rules for each certified voting system prescribing what constitutes a 'clear indication on the ballot that the voter has made a definite choice,'" id. at § 102.166(5)(b), and (2) issuing "detailed rules prescribing additional recount procedures for each certified voting system which shall be uniform to the extent practicable." Id. at § 102.166(6)(d).

The manual recount is a fairly straightforward process in optical scan counties; auditors look for stray marks that may have misled the machines or other

4

indicia that a voter has made a definite choice.  For example, a voter might circle a candidate's name rather than making the prescribed mark to indicate his choice.  In touchscreen counties, however, this process has proved more difficult.  It is impossible to overvote in a touchscreen county; the touchscreen voting machines will not allow it.  It is possible to undervote when using touchscreen voting machines, however, although the machines prompt a voter when he undervotes, providing him with an opportunity to choose a candidate for that race.

Emergency Rule

Because a touchscreen voter never records his vote onto paper, and there is no provision in these counties for contemporaneous print-outs of individual ballots, a "manual recount" in touchscreen counties does not allow for the same type of review of ballots for voter or machine error provided in optical scan counties.  In light of these characteristics of touchscreen voting systems, the Florida Department of State originally did not require manual recounts in touchscreen counties.[2]  An administrative law judge struck down the original rule that failed to require manual

---

[2] Rule 1S-2.031, which sets forth the procedures for conducting manual recounts, originally stated, in pertinent part:

> When a manual recount is ordered and touchscreen ballots are used, no manual recount of undervotes and overvotes cast on a touchscreen system shall be conducted since these machines do not allow a voter to cast an overvote and since a review of undervotes cannot result in a determination of voter intent as required by Section 102.166(5), F.S.  In this case, the results of the machine recount conducted pursuant to paragraph (5)(c) shall be the official totals for the touchscreen machines.

Fla. Admin. Code Rule 1S-2.031(7).

recounts, however, and the Secretary of State promulgated Emergency Rule 1SER04-1 in its place. The substance of the emergency rule was incorporated into the permanent rule governing manual recounts on November 3, 2005.[3] See Florida Department of State, Division of Elections Rule 1S-2.031 ("Rule 1S-2.031") .

Rule 1S-2.031 provides that if a manual recount becomes necessary, the canvassing board shall order the printing of one official copy of the ballot image report[4] from each touchscreen voting machine that has recorded undervotes for the affected race. Rule 1S-2.031(4)(b)1. If the certified voting system is capable of electronically sorting and identifying undervotes, then the canvassing board shall order the printing of a report indicating the undervotes. Id. The ballot image report shall then be examined by the counting teams to identify and highlight ballot images containing undervotes for the affected race to determine if there is a clear indication on the ballot image that the voter made a definite choice to undervote. Rule 1S-2.031(4)(b)2. For those machines capable of electronically sorting, the undervotes shall be identified by the machine. Id.

After identifying the undervotes, the counting teams shall maintain a running

---

[3] Hereinafter, we refer to provisions of the amended permanent rule governing manual recounts rather than to the emergency rule.

[4] A "ballot image" is an electronic record of the content of a ballot cast by a voter and recorded by a voting device, Rule 1S-2.031(1)(g)1, and a "ballot image report" is a printout of ballot images for each machine or precinct. Rule 1S-2.031(1)(g)2.

tally of the number of undervotes totaled per touchscreen voting machine in each precinct and then tabulate the total number of undervotes from all machines in that precinct. The counting teams shall then compare the total number of undervotes manually recounted for each precinct to the total number of undervotes reported by the voting system in the complete canvass report. Rule 1S-2.031(4)(b)5. If the comparison of the undervotes for each precinct matches the total number reported for such precinct, then the counting team shall certify the results of the machine recount to the canvassing board. Rule 1S-2.031(4)(b)6. If a discrepancy exists, however, the counting teams are to re-tabulate the number of undervotes for such precinct at least two additional times and, if necessary, the canvassing board must investigate and resolve the discrepancy. Id.

The emergency rule instructs that "[t]he clear indication that the voter has made a definite choice to undervote shall be determined by the presence of the marking, or the absence of any marking, that the manufacturer of the certified voting system indicates shall be present or absent to signify an undervote." Rule 1S-2.031(4)(a)2. The rule goes on to specify how an undervote is designated for each of the three types of touchscreen voting machines currently certified for use in Florida. See 1S-2.031(4)(a)2a-c.

State Lawsuit

7

On January 16, 2004, United States Congressman Robert Wexler filed a complaint in state circuit court against Theresa LePore, who at that time was Supervisor of Elections for Palm Beach County,[5] Secretary of State Glenda E. Hood and the Palm Beach County Board of County Commissioners. Wexler sought declaratory and injunctive relief on the grounds that the defendants, in approving touchscreen voting machines for use in Palm Beach County, violated the right to vote of Palm Beach County citizens guaranteed by the Florida Constitution. Specifically, the state complaint asserted that Florida should not have approved and certified the Sequoia AVC Edge Voting System Release 3.1 for use in Palm Beach County because, as a paperless voting system, it does not allow for the manual recounts provided for by §§ 102.141 and 102.166 of the Florida statutes.

The state circuit court dismissed the action on the grounds that Wexler lacked standing to pursue the claims. The court further found that Wexler failed to state a cause of action for injunctive relief because "the Florida statutory scheme does not clearly require a voter verified paper ballot." Wexler appealed the circuit court's order to the Fourth District Court of Appeal, which affirmed the dismissal. The Fourth District Court of Appeal found that the Secretary of State had adopted

---

[5] Arthur Anderson has replaced Theresa LePore as Supervisor of Elections for Palm Beach County.

regulations regarding methods for recounting votes pursuant to the statutes, rendering Wexler's request for declaratory relief moot, as he would first have to challenge the adopted rules in an administrative setting.

Federal Lawsuit

On March 8, 2004, Wexler, Palm Beach County Commissioners Addie Greene and Burt Aaronson, and registered Florida voter Tony Fransetta brought the present action against Secretary of State Hood, LePore (Arthur Anderson's predecessor as the Supervisor of Elections for Palm Beach County) and Kay Clem, the Supervisor of Elections for Indian River County. Initially, the district court dismissed their complaint under the Younger abstention doctrine. This court vacated that order, however, and remanded for consideration of whether the use of touchscreen voting systems that do not produce a paper record of votes and allegedly lack a manual recount procedure violates the due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution. See Wexler v. Lepore, 385 F.3d 1336 (11th Cir. 2004) (per curiam).

Following a bench trial, the district court ruled for defendants, holding that Emergency Rule 1SER04-1 established a manual recount procedure for touchscreen voting systems that both complies with Florida law and establishes a uniform, nondifferential standard for conducting manual recounts, satisfying the

9

requirements of equal protection and due process. Plaintiffs now appeal.

## II. Standard of Review

Following a bench trial, we review a district court's conclusions of law <u>de novo</u> and its findings of fact for clear error. <u>A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp.</u>, 334 F.3d 997, 1003 (11th Cir. 2003).

## III. Discussion

The basic theory of Plaintiffs' case is that by certifying touchscreen voting systems that are incapable of providing for the type of manual recounts contemplated by Florida law, the defendants have violated the equal protection and due process rights of voters in touchscreen counties. Although we agree with the district court that Florida's manual recount procedures for touchscreen counties comply with Florida law, the constitutional questions do not turn on that inquiry. Instead, we consider whether Florida's manual recount procedures, which vary by county according to voting system, accord arbitrary and disparate treatment to Florida voters, thereby depriving voters of their constitutional rights to due process and equal protection. <u>See</u> <u>Bush v. Gore</u>, 531 U.S. 98, 104-05 (2000) (per curiam).

<u>Equal Protection</u>

Plaintiffs argue that the manual recount procedure for touchscreen counties fails to provide for meaningful review of undervotes. They contend that the ballot

10

image summaries generated during recounts "do not permit the canvassing board to determine whether the voter made an intentional choice to undervote or that the machine failed to record the vote due to voter mistake, human error, or system error." Plaintiffs thus argue that Florida voters are not accorded equal treatment because those residing in optical scan counties will have an opportunity to have their residual votes reviewed in a meaningful way in certain very close elections whereas those residing in touchscreen counties will not.[6]

Plaintiffs' fundamental error is one of perspective. By adopting the perspective of the residual voter, they have avoided the question that is of constitutional dimension: Are voters in touchscreen counties less likely to cast an effective vote than voters in optical scan counties?[7] It is this question, and not the question of whether uniform procedures have been followed across a state regardless of differences in voting technology, that the Supreme Court consistently

---

[6] Plaintiffs also suggest that one problem with paperless voting systems is the possibility of machine malfunction that cannot thereafter be revealed through a manual recount. Plaintiffs argue that but for the potential for malfunction, manual recounts would not be necessary. This is incorrect. Florida's manual recount procedures are designed to uncover a variety of both human and machine errors. Moreover, because Florida's procedures dictate that only residual votes be considered in a manual recount, many types of machine malfunction discussed by witnesses at trial would not be discovered even in a manual recount of the sort Plaintiffs envision. Finally, we agree with the district court that issues of security, configuration, and system malfunction are dealt with by the State during the certification process and are not relevant to the question before this court except to the extent they make it less likely that voters using those systems will cast effective votes.

[7] The question of what magnitude of difference between voting systems' accuracy rates is necessary to raise constitutional concerns is not before this court.

11

has emphasized in its voting jurisprudence.[8]  See, e.g., Bush, 531 U.S. at 104-05 ("Having once granted the right to vote on equal terms, the state may not, by later arbitrary treatment, value one person's vote over that of another."); Dunn v. Blumstein, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); Reynolds v. Sims, 377 U.S. 533, 563 (1964) ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable."); Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964) ("[A]s nearly as is practicable[,] one man's vote in a congressional election is to be worth as much as another's.").

The right to vote is fundamental, forming the bedrock of our democracy. See Ill. Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure."); Wesberry, 376 U.S. at 17 ("Other rights, even the most basic, are illusory if the right to vote is undermined.").  Nevertheless, states are entitled to burden that right to ensure that elections are fair, honest and efficient.  See Burdick

---

[8] The problem with Plaintiffs' argument is clear when one considers that, according to Plaintiffs' theory, a hypothetical touchscreen voting system that is so nearly accurate that residual vote rates approach zero would nevertheless be constitutionally suspect if it was not susceptible to a substantially similar manual recount procedure to that applied in counties with far less accurate voting systems.

v. Takushi, 504 U.S. 428, 433 (1992); Anderson v. Celebrezze, 460 U.S. 780, 788 (1983); Storer v. Brown, 415 U.S. 724, 730 (1974). Recognizing that "[e]lection laws will invariably impose some burden upon individual voters," the Supreme Court has explained that the level of scrutiny courts apply to state voting regulations should vary with the degree to which a regulation burdens the right to vote. Burdick, 504 U.S. at 433-34; see also Siegel v. LePore, 234 F.3d 1163, 1180-81 (11th Cir. 2000) (en banc) (applying Burdick balancing to an equal protection claim in a voting case that was unrelated to ballot access). Specifically, the Court has instructed that

> [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Burdick, 504 U.S. at 434 (citations omitted). When a state election law imposes only "reasonable, nondiscriminatory restrictions" upon voters' rights, the "State's important regulatory interests are generally sufficient" to sustain the regulation. Id.

The plaintiffs argue that because voters in touchscreen counties have no opportunity to have their residual votes counted manually whereas voters in optical scan counties have such an opportunity, Florida's disparate treatment of these

13

groups warrants strict scrutiny. The plaintiffs, however, did not plead that voters

in touchscreen counties are less likely to cast effective votes due to the alleged lack

of a meaningful manual recount procedure in those counties.[9] Thus, if voters in

touchscreen counties are burdened at all, that burden is the mere possibility that

should they cast residual ballots, those ballots will receive a different, and

allegedly inferior, type of review in the event of a manual recount. Such a burden,

borne of a reasonable, nondiscriminatory regulation, is not so substantial that strict

scrutiny is appropriate. See id. at 434 (holding that a regulation imposing "severe"

restrictions must be "narrowly drawn to advance a state interest of compelling

importance"); Weber v. Shelley, 347 F.3d 1101, 1106 (9th Cir. 2003) ("We cannot

say that use of paperless, touchscreen voting systems severely restricts the right to

vote."); cf. Stewart v. Blackwell, 444 F.3d 843, 868-72 (6th Cir. 2006) (applying

strict scrutiny where plaintiffs "alleged vote dilution due to disparate use of certain

voting technologies").[10] Thus, we review Florida's manual recount procedures to

[9] The district court accordingly made no findings of fact with respect to the accuracy of the competing voting systems. At trial, experts gave conflicting testimony regarding accuracy rates, and although the parties introduced some academic research on the question along with data on residual vote rates in Florida counties, the evidence in the record is sparse on this question.

[10] In Stewart v. Blackwell, plaintiffs challenged Ohio's continued use of punch card voting systems in certain counties under the Voting Rights Act and the Equal Protection and Due Process clauses of the Fourteenth Amendment. 444 F.3d 843. The plaintiffs argued that their right to have their votes counted on equal terms with other citizens had been denied, relying on evidence showing higher residual vote rates among voters using punch card equipment than among those using other types of equipment, including touchscreen voting machines. Id.

14

determine if they are justified by the State's "important regulatory interests." See

Burdick, 504 U.S. at 434.

Here, Florida has important reasons for employing different manual recount procedures according to the type of voting system a county uses. The differences between these procedures are necessary given the differences in the technologies themselves and the types of errors voters are likely to make in utilizing those technologies. Voters casting optical scan ballots can make a variety of mistakes that will cause their ballots not to be counted. For example, a voter casting an optical scan ballot might leave a stray pencil mark or circle a candidate's name rather than filling in the appropriate bubble. Thus, although an optical scan tabulation machine may register an undervote for a particular race on a particular ballot, there may be sufficient indicia on the ballot that the voter actually chose a candidate in that race such that the vote would be counted in a manual recount. In contrast, a voter in a touchscreen county either chooses a candidate for a particular race or does not; the touchscreen machines do not record ambiguous indicia of voter intent that can later be reviewed during a manual recount.

Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, "local variety [in voting systems] can be justified by concerns about cost, the potential value of innovation,

15

and so on." Bush, 531 U.S. at 134 (Souter, J., dissenting). Among other things, witnesses for the State testified that touchscreen machines have certain benefits for disabled voters and they prevent some of the voter errors that are characteristic of optical scan voting systems. Accordingly, we hold that Florida's manual recount procedures are justified by the State's important regulatory interests and, therefore, they do not violate equal protection. See Burdick, 504 U.S. at 434.

Due Process

Plaintiffs argue that Florida's manual recount procedures are devoid of "fundamental fairness," thereby depriving voters of due process. See Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring). However, as we noted above, whatever burden, if any, Florida's manual recount procedures place on voters, that burden is justified by the important regulatory interests outlined above. Therefore, we hold that Florida's manual recount procedures do not deprive voters of due process.

For the foregoing reasons, the judgment of the district court is AFFIRMED.